**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____

**CORNELIUS V. HOSCH,**                     )
                                             )
          **Plaintiff**,                     )
                                             )
**v.**                                       )          **Case No.: 1:13-cv-00825-AJT-TCB**
                                             )
**BAE SYSTEMS INFORMATION**                  )
**SOLUTIONS, INC.,**                         )
                                             )
          **Defendant**.                     )
_____)

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR**
**DEFENDANT'S FAILURE TO COMPLY WITH THIS COURT'S DISCOVERY ORDER**

Pursuant to Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37(H),

Plaintiff Cornelius V. Hosch ("Plaintiff" or "Hosch"), by and through counsel, has moved this

Court to sanction Defendant BAE Systems Information Solutions, Inc. ("Defendant" or "BAE")

for failure to comply with this Court's December 6, 2013 order to produce BAE's contract with

the government regarding Counter-IED intelligence.  This Court ordered BAE to produce the

contract at issue in this case, but BAE has failed to produce it.  Instead, BAE continues to justify

its non-compliance and improperly attempts to limit the Court's December 6, 2013 Order

without any basis.  Hosch seeks an order requiring BAE to turn over the contract and to pay all

fees associated with the motion to compel, the hearing on the motion to compel, and this motion

for sanctions, and all other sanctions this Court may deem necessary and proper.

**I.      THIS COURT ORDERED DEFENDANT TO PRODUCE THE CONTRACT AND**
        **BAE HAS FAILED TO PRODUCE IT.**

This Court's order granting in part Plaintiff's motion to compel and ordering BAE to

produce the **entire** contract at issue in this case is clear.

1

> THE COURT: Okay.  So, why does he need the whole contract if
> he has already got part of at least, or I assume the relevant part?
> MR. CARTER: Well, that's just it, I don't think we do have the
> relevant part.  We have – he testified that while at BAE he had the
> relevant part, but we do not have the contract with the billing
> categories, the charges, those kinds of things.
> THE COURT: Okay, I'm going to make you produce that and be
> subject to counsel and just the plaintiff's eyes only, no one else,
> unless you have an expert.

*See* Ex. A at 12.  No reasonable person could conclude from this order that BAE had anything

less than a comprehensive obligation to produce the contract that has not yet been produced by

BAE to date.  This Order demands the production of the entire contract at issue in this case and

at a minimum the relevant portions that include the billing categories and pricing information to

show that BAE was engaging in timecard and billing fraud.  BAE's position is that Hosch had

access to the Statement of Work and since Hosch produced that document already in discovery,

that is all that BAE needed to confirm.

To avoid any confusion on BAE's obligation to produce the contract, this Court further

clarified BAE's obligations when responding to BAE's excuse that the DIA would have to

approve the production.

> MS. BERTRAM: The only issue is DIA may itself impose some
> restrictions.  So, we'll need to see what –
> THE COURT: Well, I've got an order that I'm going to enter –
> MS. BERTRAM: Right
> THE COURT: -- that says you have to produce it.
> MS. BERTRAM: Right.
> THE COURT: So, it doesn't matter what they think
> MS. BERTRAM: Okay.
> THE COURT: Okay.

*See* Ex. A at 12-13.

This Court clarified BAE's obligation even a third time.

> THE COURT: So, as to your motion to compel, it's granted in part
> as to the 30(b)(6) and denied in part.

> MR. CARTER: And granted in part with respect to the contract?
> THE COURT: Yes.
> MR. CARTER: Thank you.

*See* Ex. A at 14.

Despite this clear Order from this Court, BAE refuses to produce the contract at issue and even seeks to place the onus of its obligation to this Court on Hosch. *See* Ex. F to Def.'s Opp'n to Pl.'s Mot. for Sanctions. In Ms. Bertram's letter, BAE insists Hosch deleted the relevant portion of the contract to which he had access. *Id.* First, there is no evidence produced to date that that is indeed the case and BAE's accusation of the same is dishonest. Hosch testified that he did not even have administrative access to the Shared Drive on which he accessed the contract and thus could not delete it. Hosch Dep. Tr., Ex. B at 77-80. Second, even if Hosch could delete his local access to the contract (which he did not), surely BAE has a copy of the contract in a location other than the location accessed by Hosch in Afghanistan. BAE admitted it has possession of the relevant portions of the contract when it sought to excuse its already-contemplated lack of compliance with the Court's Order by blaming its inability to produce it on the DIA. *See* Ex. A at 12-13. BAE noted during the hearing that Hosch had "online access to what he characterized as the entire contract" but that "we have to get authorization from DIA to produce that contract." Ex. A at 12. BAE also recognizes Hosch had access to the entire contract via his military computer. Decl. of Connie Bertram, Ex. A at 186-87. Third, BAE asserts that Hosch himself produced the portion of the contract to which he had access. Once again, the Court unequivocally ordered BAE to produce the parts of the contract that which are not included in the brief Statement of Work produced by Hosch. *See* Ex. A at 12-13. The Court obviously ordered BAE to produce something and it is not sufficient for BAE to simply confirm that Hosch's produced version of the Statement of Work is indeed the right one. It is clear that

the remaining portions of the contract are in BAE's possession, custody, or control, but that BAE

refuses to produce it.  The pricing information, the billing categories, and the like are all

excluded from the Statement of Work and have not been produced by either party in this

litigation.

## II.     PLAINTIFF MET AND CONFERRED WITH DEFENDANT IN GOOD FAITH REGARDING DEFENDANT'S OBLIGATIONS PURSUANT TO THE ORDER.

BAE continues to refuse to produce the relevant portions of the contract despite meeting

and conferring in good faith.  When Hosch filed this motion for sanctions, Counsel for BAE and

Counsel for Hosch had already exchanged multiple letters and emails addressing BAE's

obligations under this Court's Order.  BAE's position that it was not going to produce the

contract was clear since the Court's order was issued.  On December 12, 2013, Counsel for BAE

and counsel for Hosch discussed via email correspondence BAE's obligation to produce the

contract as ordered.  *See* Ex. A to Pl.'s Mot. for Sanctions.  On December 13, 2013, prior to a

deposition of a fact witness, Hosch's Counsel discussed in person whether BAE had any

intention to comply with the Court's Order.  *See* Ex. B to Pl.'s Mot. for Sanctions.  Then on

December 20, 2013, Plaintiff's Counsel again sought clarification as to why BAE continued to

refuse to produce the contract.  *See* Ex. C to Pl.'s Mot. for Sanctions.  BAE failed to respond on

that issue.  *See* Ex. C to Pl.'s Mot. for Sanctions.  On the day Hosch filed this motion for

sanctions, as a courtesy to BAE, the undersigned sent Counsel for BAE an email indicating his

intent to file a motion for sanctions unless the contract was produced.  BAE could have indicated

its intent to produce the contract on the following Monday or that BAE required additional time

to comply.  Set in its position to ignore the Court's Order, BAE instead responded with personal

attacks and false accusations.  *See* Ex. D to Pl.'s Mot. for Sanctions.  It was made even clearer to

Plaintiff that Defendant did not intend to produce the contract.

4

Hosch was correct in filing this motion for sanctions because since filing this motion

BAE has continued to refuse to comply with this Court's order.   BAE has drafted two additional

letters and the parties discussed the matter via telephone.   During these exchanges BAE

continued to ignore the Court's Order and sought to blame Hosch for its own failure to comply.

From this Court's Order on December 6, 2013 until now, Defendant has refused to produce the

contract and only sanctions will incentivize Defendant to fulfill its obligations to this Court and

to Plaintiff.

## III.   SANCTIONS ARE AN APPROPRIATE REMEDY FOR DEFENDANT'S CLEAR VIOLATION OF THIS COURT'S ORDER

BAE's disregard for this Court's order warrants the imposition of sanctions against

Defendant.  This Court has "nearly unfettered discretion" in determining whether to issue

sanctions.  *See SunTrust Bank v. Mohsen Moslehi Nik*, 2012 WL 1344390 at *2 (E.D. Va. 2012)

(Buchanan, J.) (citing *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 429 (4th Cir. 1996)).

After exercising that discretion and determining that sanctions are appropriate, this Court may

consider four factors in determining what level of sanctions to impose: (1) whether the non-

complying party acted in bad faith; (2) the amount of prejudice that noncompliance caused the

adversary; (3) the need for deterrence; and (4) whether less drastic sanctions would be effective.[1]

These four factors weigh in favor of imposing sanctions against Defendant.

As to the first factor, BAE has acted in bad faith.  As noted above, BAE never really

intended to comply with this Court's order.  BAE's position before and after this Court's order

has not changed.  Despite never intending on producing the contract and never changing its

---

[1]     BAE asserts that these four factors must be met for *any* sanctions to be imposed.  That is inaccurate.  These four factors are used rather to determine "what sanctions to impose under Rule 37" and not whether sanctions are appropriate at all.  *See Colquitt v. Fairfax Cnty. Pub. Schs.*, 2012 WL 3648058 at *3 (E.D. Va. Aug. 3, 2012) (Buchanan, J.) (quoting *Anderson v. Found. For Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998).

position, BAE continues to insist the parties meet and confer.  The purpose of meeting and

conferring is to try to reach an agreement and is not an opportunity for one party to abuse the

process and seek to delay a motion for sanctions as long as possible.  BAE's willful disobedience

of the Court's order is evidenced by BAE's continual refusal to produce the contract despite

Hosch's repeated demands and multiple attempts at meeting and conferring.  Even after filing

this motion for sanctions, BAE refused to comply with this Court's Order.  *See* Ex. F to Def.'s

Opp'n to Pl.'s Mot. for Sanctions.  Defendant even seeks to blame Plaintiff for Defendant's

inability to produce the contract.  *See* Def.'s Opp'n to Pl.'s Mot. for Sanctions.  As to the second

factor, Plaintiff has been unduly prejudiced by Defendant's refusal to produce the contract.

Plaintiff has a right to all the documents he used to engage in protected activity.  By not

producing the contract, Defendant would unjustly limit Plaintiff in being able to bring his claim

before a jury to show that he engaged in protected activity – a critical element of his retaliation

claim.

As to the third and fourth factors, Defendant is willfully ignoring the order of this Court

to produce the contract at issue in this case.  This Court must impose sanctions sufficient to deter

Defendant and Defendant's Counsel from further ignoring clear and unequivocal orders of this

Court.  Defendant has also abused the meet and confer process when it continued to demand that

Plaintiff meet and confer when for a whole month the parties exchanged multiple letters and

emails and Defendant never deviated from its refusal to comply with this Court's order.  Even

after Plaintiff notified Defendant of his intention to file this motion for sanctions because of

Defendant's refusal to produce the contract, Defendant reemphasized its position and insisted it

did not have to comply with this Court's order.  Sanctions are required as they are here when

Defendant's noncompliance is blatant.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court GRANT

Plaintiff's Motion for Sanctions for Defendant's Failure to Comply with this Court's Discovery

Order, and require the Plaintiff to provide an accounting for his fees and costs within five (5)

days.  In addition, or in the alternative, Plaintiff respectfully requests that this Court award

Plaintiff an adverse inference instruction against BAE or disallow BAE from opposing Plaintiff's

factual presentation of what the contract at issue in this case provides.


Cornelius V.  Hosch
*By Counsel*


  */s/ Adam Augustine Carter*
R.  Scott Oswald, Esq.
VSB# 41770
Adam Augustine Carter, Esq.
VSB# 32722
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, NW, 9th Floor
Washington, D.C.  20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of January, 2014, a true and correct copy of

the foregoing Reply in Support of Plaintiff's Motion for Sanctions for Defendant's Failure to

Comply with this Court's Discovery Order was served with the Clerk of the Court using the

CM/ECF system, which will then send a notification of such filing (NEF) to the following:

        Connie N.  Bertram, Esq.
        Guy Brenner, Esq.
        Proskauer Rose LLP
        1001 Pennsylvania Avenue, NW
        Suite 400 South
        Washington, DC  20004
        cbertram@proskauer.com
        gbrenner@proskauer.com
        *Counsel for Defendant*

          */s/ Adam Augustine Carter*
        R.  Scott Oswald, Esq.
        VSB# 41770
        Adam Augustine Carter, Esq.
        VSB# 32722
        THE EMPLOYMENT LAW GROUP, PC
        888 17th Street, NW, 9th Floor
        Washington, D.C.  20006
        (202) 261-2803
        (202) 261-2835 (facsimile)
        soswald@employmentlawgroup.com
        acarter@employmentlawgroup.com
        *Counsel for Plaintiff*

# EXHIBIT A

1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division


------------------------------:
                              :
CORNELIUS V. HOSCH,           :
                Plaintiff,    :
                              :
    -vs-                      :       Case No. 1:13-cv-825
                              :
                              :
BAE SYSTEMS INFORMATION       :
SOLUTIONS, INC.,              :
                Defendant.    :
                              :
------------------------------:




                         HEARING ON MOTIONS


                         December 6, 2013


               Before:  Theresa C. Buchanan, Mag. Judge






APPEARANCES:

Adam A. Carter, Counsel for the Plaintiff

Connie N. Bertram, Counsel for the Defendant

2

1          NOTE:  The case is called to be heard at 10:19 a.m.

2   as follows:

3          THE CLERK:  Hosch versus BAE Systems Information

4   Solutions, Inc., case 13-cv-825.

5          MR. CARTER:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. CARTER:  Adam Carter with The Employment Law

8   Group on behalf of Vince Hosch.

9          MS. BERTRAM:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MS. BERTRAM:  Connie Bertram for defendant BAE

12   Systems.  And I am here with Christine Roth, who is with BAE

13   Systems.

14          THE COURT:  All right.  Let's deal first with the

15   plaintiff's motion to compel.  Do you have anything to add to

16   that?

17          MR. CARTER:  Just that my client has the burden, Your

18   Honor, of showing that he has a good faith belief when he

19   brings his concerns forward, and it helps to know that he's

20   correct.

21          THE COURT:  Well, no, that's not the issue.  I mean,

22   the issue is what he knew at the time, and was that a

23   reasonable basis for his belief.  Not whether you can prove

24   that that was correct or that there was more wrongdoing on

25   behalf of the defendant or anything else.

3

1          MR. CARTER:  I don't disagree with you, he doesn't

2    have to be correct.

3          THE COURT:  Right.

4          MR. CARTER:  My point is that when you want to show

5    intent of the defense to retaliate, when he is correct, they

6    have greater reason to retaliate.

7          That's the point, is that when I get access, if I can

8    show the contract was -- he was right about the contract, he

9    was right about the timecards, he was right about the billing,

10   it's not just what he knew, that's part of it, but then you

11   flip it around and you ask, what is -- I have to show intent of

12   the defendant to retaliate.  And when I do that -- or if I --

13   if they are correct, then they have a greater motive to

14   retaliate.

15         So, that's the -- that's the broad view.  The more

16   narrow with respect to each of these requests is on these

17   requests for admissions, the objection was that I had to make

18   some kind of a showing.  And I just didn't understand what that

19   meant.

20         When am I supposed to make that showing?  When is

21   this supposed to happen during discovery?  I propound discovery

22   requests and I think that they should be answered.

23         And then with respect to the 30(b)(6) witness,

24   quickly.  The point there is that I propounded by deposition

25   notice.  Defense counsel propounded objections.  We talked

4

1    about some of them.  We said, let's exchange written discovery

2    first.  We did that.

3              But now I'm facing with a 30(b)(6) deposition on

4    Monday, and I have no idea what I'm getting.  Defense

5    counsel -- or defendant rather has not told me what I'm

6    getting, what the objections are.

7              And so, I think that the -- I am requesting that the

8    Court rule on the objections.

9              THE COURT:  Okay.  Ms. Bertram, I have a question for

10   you specifically about requests for admissions 25, 27 and 33.

11   Do you have an objection to those?  These are all admitting or

12   denying that he made certain complaints on certain dates.

13             MS. BERTRAM:  Your Honor, for 25, we submitted a

14   supplemental response.

15             THE COURT:  Okay.  So, that one has been answered?

16             MS. BERTRAM:  It has been answered.  And --

17             THE COURT:  And you made that without subject to a

18   whole bunch of objections?

19             MS. BERTRAM:  That's correct, we have admitted or

20   denied.

21             THE COURT:  Okay.

22             MS. BERTRAM:  We'll see what we actually did --

23             THE COURT:  27.

24             MS. BERTRAM:  For 27, we denied.

25             THE COURT:  But you did answer?

5

1           MS. BERTRAM:  We answered, yes.

2           THE COURT:  Okay.  And 33?

3           MS. BERTRAM:  And 33 we denied.

4           THE COURT:  Why didn't you answer that one?

5           MS. BERTRAM:  We answered it, I'm sorry.

6           THE COURT:  Oh, I'm sorry.

7           MS. BERTRAM:  We answered it as a denial.

8           THE COURT:  Okay.

9           MS. BERTRAM:  What happened is Mr. Carter and I had

10  conferred before Thanksgiving, and I told him that we -- that

11  now that Mr. Hosch had identified through his deposition what

12  he relied upon in making his claimed complaints, that we would

13  be supplementing our --

14          THE COURT:  Okay.

15          MS. BERTRAM:  -- responses to the interrogatories.

16  So, I --

17          THE COURT:  What objections do you still have to the

18  30(b)(6)?  I wasn't quite sure.

19          MS. BERTRAM:  On the 30(b)(6), really just centers on

20  the scope of the topics that are included in it.

21          For instance, a couple of different categories that

22  are objectionable.  First of all, the first several requests,

23  for instance, a witness to testify as to each and every

24  document request and interrogatory response, which we think is

25  inappropriate.  They also request that we describe the basis

6

1   for every answer -- our answer to every allegation of the

2   complaint and every affirmative defense, which is protected by

3   the work product doctrine.

4          When you get into the substantive --

5          THE COURT:  Well, it says all factual bases.

6          MS. BERTRAM:  Those are, Your Honor -- there is a lot

7   of case law addressing this that we cited in our briefing --

8          THE COURT:  No, I mean, I don't think that it's

9   necessarily asking for attorney/client or work product

10  information.  He's asking for the factual basis as to the

11  affirmative defenses.

12         MS. BERTRAM:  Right.  And we did that yesterday, we

13  had a deposition of one of the factual witnesses yesterday.

14  And Mr. Carter went through the allegations of the complaint

15  and asked him questions reading -- reading the factual

16  allegations.  And the witness responded to questions based on

17  that.  And we don't have any objection to that.

18         What our understanding of it -- of the scope of it

19  was that we were being requested to describe why we had

20  answered a certain way, which we thought implicated work

21  product.  We are certainly willing to answer the factual piece

22  of it.

23         THE COURT:  Okay.

24         MS. BERTRAM:  And then we get into the issue that

25  Your Honor raised, which is the scope --

1          THE COURT:  Well, let me skip over.  Are you

2    objecting to 4 through 9?

3          MS. BERTRAM:  Let me just pull up the --

4          THE COURT:  Let's see, this is -- wait a minute.  Why

5    do I have two 30(b)(6) -- oh, this is the first and the second.

6    Did they change?

7          MS. BERTRAM:  They did not change.

8          THE COURT:  Okay.  So, I'm looking at the one for

9    December 5, is that correct?  Did you all change the date?

10          MR. CARTER:  It's October 28.

11          THE COURT:  I'm looking at the notice dated

12    December 5.  Is that the wrong one to look at?

13          MS. BERTRAM:  It doesn't matter which one you look at

14    because they're identical.

15          THE COURT:  Okay.

16          MS. BERTRAM:  Okay.

17          THE COURT:  So, 5 -- 4 through 9, is there any

18    objection to those?

19          MS. BERTRAM:  We have an issue with 4 in terms of

20    scope, 4 and 5 in terms of scope.  If they just want general

21    information about where the company looked for documents and

22    what we produced, I don't think that's objectionable.

23          But the retention of all documents relevant to the

24    subject matter seemed overly broad.  It appears to be Mr.

25    Carter's interpretation, and this came up in the deposition

8

1   yesterday, that we have an obligation to produce every document

2   that has Mr. Hosch's name on it.  Which, obviously, we don't.

3          So, there is kind of a basic dispute about what's

4   relevant in this case.  And Your Honor referenced a core issue

5   earlier, talking about the scope of what Mr. Hosch knew and the

6   underlying fraud.

7          So, to the extent that we are talking about what we

8   produced and what we looked for, we don't have an objection to

9   that.  But I don't think we should be required to have someone

10  testify as to every document at BAE Systems with Mr. Hosch's

11  name on it.

12         THE COURT:  Okay.  What about -- let's go through the

13  remainder, the remaining topics.  What are your objections to

14  those?  Let's skip over 10.  Go to 11.  Really it's 11, 12 that

15  go together.

16         MS. BERTRAM:  Yeah, 11 and 12 we've already produced

17  a witness, and they've testified fully --

18         THE COURT:  Okay, so that's denied.

19         MS. BERTRAM:  -- as to those topics.

20         THE COURT:  All right.  13.

21         MS. BERTRAM:  13 was overly broad because it relates

22  to every single piece of correspondence and workplace

23  discussion between --

24         THE COURT:  Right, okay.

25         MS. BERTRAM:  -- the plaintiff and his supervisor.

1    And they communicated on a daily basis.  We thought that was --

2              THE COURT:  14 is, let's see --

3              MS. BERTRAM:  14 is essentially the --

4              THE COURT:  Regarding Hosch's performance, job

5    responsibilities or disclosures.

6              MS. BERTRAM:  We can produce somebody on that.

7              15 implicates the issue that we've been talking

8    about.

9              And then with respect to 16 and 17, we're planning on

10   producing a witness, but to testify more generally than the

11   detailed listing of topics identified in 16.

12             THE COURT:  Okay.  All right.  So, did you have

13   anything else to add, Ms. Bertram?

14             MS. BERTRAM:  Well, with respect to the -- the kind

15   of core issue on discovery.  You know, I actually don't think

16   that Mr. Carter is going to be dissatisfied with our Rule

17   30(b)(6) deponent on Monday.  He made the comment that when we

18   presented our first witness, he said she testified unfettered

19   as to the topics.  Some of the topics are overly broad.  We're

20   presenting the witnesses on the topics that we feel are

21   relevant to the case.  He has been satisfied thus far, and I

22   think he will be satisfied on Monday.  If he is not, we could

23   have a call or discuss it, but I think he is going to be

24   satisfied.

25             I think the core issue though where we still have a

1    dispute is this issue of the underlying fraud.

2            THE COURT:  I understand.  Do you have anything to

3    add, Mr. -- I'm sorry, what was your name again?  Mr. Carter.

4            MR. CARTER:  Yes, ma'am.  Just a point of correction.

5    Yesterday was not a 30(b)(6) deposition.  And, of course, Your

6    Honor knows the quality of the evidence is very different.  You

7    need to know it's a 30(b)(6) when you're -- when you're taking

8    it.

9            But I appreciate Your Honor intervening here because

10   this is what I was trying to get from --

11           THE COURT:  Okay.

12           MR. CARTER:  -- Ms. Bertram that I was not able to.

13   So, thank you.

14           THE COURT:  All right.  Well, as to your motion to

15   compel, we're not going to get into you trying the case within

16   a case.  It's just not relevant, it's not going to happen.

17   We're going to limit this to what he knew at the time and

18   whether or not that was a reasonable basis for his complaint.

19           So, beyond what information he had and discovery

20   related to what he says he had, which I understand you've now

21   found during his deposition, we're just not going to go beyond

22   that.

23           So, I'm not going to grant your motion to compel as

24   to the discovery requests because the only three that I thought

25   that were really at issue that should be answered by the

1   defendant have been now answered with the supplement.

2          Now, as to --

3          MR. CARTER:  May I just seek a clarification on that,

4   Your Honor?

5          THE COURT:  Okay.

6          MR. CARTER:  He did testify that he knew about

7   certain things in his deposition.  And if Your Honor is ruling

8   then covers -- he knew about the contract, he knew about the

9   timecards, we should be able to get the discovery of --

10          THE COURT:  No, no.

11          MR. CARTER:  When he said he knew about them?

12          THE COURT:  Yeah, but you don't need to verify them

13   through their discovery.  If he had it -- if he had the

14   information, then you're limited to that.  But if you're asking

15   about going back through there, that's what all of your

16   discovery was related to, going back and then trying to prove

17   that he was right.  We're not going to do that.

18          MR. CARTER:  I just mean -- I just mean when he was a

19   BAE employee, he had the contract.  Now he doesn't.  But the --

20          THE COURT:  Well, as I understood the answers from

21   the -- in the plaintiff's opposition, you said that you did

22   produce the documents that he said that he had at the time he

23   made his decision, isn't that correct?

24          MS. BERTRAM:  Your Honor, with respect to the

25   contract, the plaintiff himself removed from BAE Systems and

1    then produced back to us a portion of the contract during his

2    deposition.  He clarified that he also had online access to

3    what he characterized as the entire contract.

4          We have to get authorization from DIA to produce that

5    contract, and we're going through that process.  Other than

6    that portion, everything else has been produced that he

7    identified in his deposition.

8          THE COURT:  Okay.  So, why does he need the whole

9    contract if he has already got part of at least, or I assume

10   the relevant part?

11         MR. CARTER:  Well, that's just it, I don't think we

12   do have the relevant part.  We have -- he testified that while

13   at BAE he had the relevant part, but we do not have the

14   contract with the billing categories, the charges, those kinds

15   of things.

16         THE COURT:  Okay.  I'm going to make you produce that

17   and be subject to counsel and just the plaintiff's eyes only,

18   no one else, unless you have an expert.  But I don't think -- I

19   think if we put it under a sealing order, then the parties

20   don't have to worry about it.

21         MS. BERTRAM:  Right, Your Honor, we were going to ask

22   for attorney's eyes only protection.  So, that's perfect.

23         The only issue is DIA may itself impose some

24   restrictions.  So, we'll need to see what --

25         THE COURT:  Well, I've got an order that I'm going to

1    enter --

2            MS. BERTRAM:  Right.

3            THE COURT:  -- that says you have to produce it.

4            MS. BERTRAM:  Right.

5            THE COURT:  So, it doesn't matter what they think.

6            MS. BERTRAM:  Okay.

7            THE COURT:  Okay.

8            MS. BERTRAM:  Well, hopefully they'll -- everybody

9    will be aligned on this.

10           THE COURT:  Okay.  Then as to the deposition topics,

11   as to number 3, I'm going to limit that to the factual

12   assertions made.

13           I'm assuming that as to number 4, he's really not

14   going to get into -- and am I right here, Mr. Carter, that

15   you're not going to get into anything other than where they

16   searched for these files and where they normally are kept and

17   that sort of thing?

18           MR. CARTER:  Yes, ma'am.

19           THE COURT:  Okay.  So, I'm going to allow all that.

20           I'm not going to allow 10.

21           I'm not going to allow 13 as worded because it is

22   entirely too broad.  If you want to talk about in terms of what

23   your trying to limit that to and you come to some agreement,

24   that's fine.  But as it stands, I'm not going to allow 13 as

25   it's worded.

14

1           And 15 I'm not going to allow either.

2           The rest of it is going to be allowed.

3           MR. CARTER:  The rest is going to be what?  Sorry.

4           THE COURT:  Pardon me?  The rest will be allowed.

5    The rest of those categories will be allowed.

6           So, as to your motion to compel, it's granted in part

7    as to the 30(b)(6) and denied in part.

8           MR. CARTER:  And granted in part with respect to the

9    contract?

10          THE COURT:  Yes.

11          MR. CARTER:  Thank you.

12          THE COURT:  And I will note that.

13          Now, as to the defendant's motions to compel, do you

14   have anything to add to those?

15          MS. BERTRAM:  Your Honor, with respect to the

16   forensic inspection, we had requested this routine -- requested

17   this after we served discovery requests because we had

18   information that the plaintiff had carried with him while he

19   was in Afghanistan a computer or device that he used to

20   download information to.  And that he used a cell phone that is

21   called a Roshan phone that was a personal phone, and he used

22   that for BAE business, for texting and for phone calls.

23          In addition, when we -- when the BlackBerry, his

24   company-issued BlackBerry was returned to us, it had been

25   wiped.  So, we requested a forensic inspection of the

1   computers.  There were objections to that.  We reissued the

2   notice, gave additional time so that we could confer.  And we

3   were repeatedly told no, no, no, no.

4           When we took the plaintiff's deposition on

5   November 4, the plaintiff testified that he routinely forwarded

6   BAE company e-mails to his personal e-mail account.  He said it

7   was so routine that he didn't even look at them, he just

8   started forwarding every e-mail to his personal e-mail account.

9           This is relevant to the claims because a lot of these

10  e-mails relate to the claims.  In addition, it relates to our

11  McKinnon defense based on his violations of our company

12  policies and theft of our documents.

13          In addition, he said he had a practice of taking

14  notes in a notebook and then after the meeting he would go back

15  to his military-issued computer, draft an e-mail or a summary

16  of those notes, shred the notes, and then he saved the e-mail

17  or the summary into a file on that computer called BAE

18  Concerns.

19          Then when he was requested to transfer to another --

20  to another region as a disciplinary matter, he started

21  undertaking steps to go on medical leave and go back to the

22  United States.  And at that point he says that he copied onto

23  this personal drive or personal storage device that he had with

24  him all the e-mails that he had saved, the Word documents, and

25  then everything, quote, everything he had on his desktop on the

1    military computer.  And then took that back to the United

2    States with him.

3           There are a lot of discrepancies in the production

4    that lead us to believe that not everything has been produced

5    and to lead us to want to inspect the Roshan, the storage

6    device, and Mr. Hosch's other computers.

7           And the -- interestingly, this personal drive was not

8    identified by the plaintiff in his responses to interrogatory

9    number 17.  We only found out about it through pressing him

10   during the course of his deposition.

11          And we think that it's very significant that

12   throughout this whole process when he was downloading and

13   making memos to file and copying items to his drive, that he

14   anticipated litigation with the company.  He had told

15   co-workers throughout his employment with BAE Systems that he

16   was planning to sue the company, that he wanted to bring the

17   company down, and apparently was collecting evidence, and

18   admitted that in his deposition.  He said, this was evidence,

19   that's why I forwarded it to my personal e-mail account, and

20   that's why I put it in this file, and that's why I downloaded

21   it.

22          In addition, he did file complaints while he was

23   employed with the company with the company's ethics line and

24   then with the Department of Defense IG's Office.  And he said

25   in his DoD complaint that he planned to pursue additional

1    remedies.

2              So, he had an obligation to preserve this evidence

3    and not to spoliate.  And I think there is enough activity and

4    the lack of production that we've shown through our papers,

5    that a forensic inspection is more than warranted.

6              THE COURT:  All right.  Mr. Carter, as I understand

7    it also, it was -- he testified in his deposition that he

8    destroyed some of the documents on his personal computer?

9              MR. CARTER:  No, Your Honor, that's not exactly

10   right.  What he testified to was that he cleaned up the folder

11   that's on the Share Point at the Army.  It's the Army

12   documents.  And that he had access to a Share Point, and that

13   before turning it over, he got rid of extraneous stuff, things

14   that were personal, things that, you know, he didn't need to

15   keep when turning it over to his successor.  That's what he

16   testified about.

17             He didn't testify or admit to destroying anything.

18   And indeed, the contrary is true.  He, as Ms. Bertram points

19   out, he did retain his copies.  After taking his handwritten

20   notes, he transposed them and preserved them.  This was all

21   prior to his being terminated.

22             He did make complaints to the company ethics and to

23   DoD IG, but he told company ethics that he had no reason to sue

24   anybody.  Of course, they hadn't terminated him yet.

25             So, the only thing that he says that he "destroyed"

18

1   was the -- what he said was in the ordinary course of business

2   cleaning up a file to take out old versions of documents when

3   the most recent versions were there, that kind of thing.

4         With respect to the motion at bar, there is nothing

5   to produce.  I can tell you --

6         THE COURT:  Well --

7         MR. CARTER:  He has this --

8         THE COURT:  Okay.

9         MR. CARTER:  He has this external drive that we asked

10  him as his counsel to use to download everything that was in

11  his personal e-mail so that we would have a full copy,

12  electronic copy.  And the only things that we have not produced

13  are the subject of the other motion that's before the Court.

14        THE COURT:  Okay.  Let me go ahead and deal with that

15  then.  Ms. Bertram, I understand your motion.  My question is

16  as to the prior employment because, as I understand it, the one

17  issue that would be of question with regard to his prior

18  employment you also investigated jointly, is that correct?

19        MS. BERTRAM:  Your Honor --

20        THE COURT:  Prior to his being employed by you.

21        MS. BERTRAM:  Apparently there were several incidents

22  when he was at SAIC.  Only the last one was jointly

23  investigated by us.

24        THE COURT:  Why are the prior ones relevant?

25        MS. BERTRAM:  Your Honor, I think they show a pattern

1   of conduct that's relevant to, you know, his knowledge and

2   understanding in terms of the reasonableness of his belief.

3          When Mr. Hosch left the military, he went almost

4   immediately into working in the Middle East for government

5   contractors.  So, he has worked on similar contracts throughout

6   his private employment.

7          And he worked on our contract, the BAE Systems CIED

8   contract, as a subcontractor for SAIC.  He relies on events

9   that occurred while he was at SAIC to support his complaint.

10  And in fact, requested from us documents from that time period

11  in support of his claims.

12         I don't think that he can request those documents,

13  use those documents, and then deprive us of all of the

14  documents relating to his employment with SAIC and with

15  subsequent contractors.

16         And, you know, a lot of these contracts are -- are

17  structured similarly.  They are with a lot of the same entities

18  and agencies.  And that forms the base of knowledge that Mr.

19  Hosch had in assessing the reasonableness of his claimed belief

20  that the company was engaging in fraud by misclassifying

21  employees or asking them to work outside of the scope of their

22  classification.

23         And so, if he was working on the contract and while

24  he was at SAIC, for instance, he recommended that an analyst

25  named Marilsa Santiago be hired because he felt that she was

20

1    qualified to be a Sydney operator, that occurred at SAIC, he is

2    now claiming that her being assigned as a CIDNE operator is

3    fraudulent.

4              So, the events that occurred back at SAIC are clearly

5    relevant to what's happening now.  And the experiences that he

6    had at other contractors with the assignment of personnel and

7    such are also material.

8              And, you know, if -- I don't know what he was

9    disciplined for at SAIC.  I have a partial production at this

10   point from SAIC, and it does appear that there were several

11   incidents where he was disciplined and counseled.  And if he

12   was counseled about similar incidents to those that led to his

13   termination or that relate to the bases for his allegations of

14   fraud, those would be relevant.

15             In addition, and I think this is probably the most

16   significant, if you look at his expert report, his experts rely

17   on his history of employment as -- in computing his $2 million

18   in back pay and front pay that he seeks.  And again, he can't

19   be permitted to use that evidence affirmatively in order to

20   bolster and support his damages claims while at the same time

21   depriving us of discovery concerning prior employers.

22             And if you think about it, Your Honor, you know, for

23   this particular category, we're just asking him to provide the

24   files that he has in his possession, custody, or control

25   relating to prior employment.

1          I don't anticipate that there is a large volume that

2   he has, but he's declined to produce any of those.

3          We also need a release to obtain records from the

4   prior employers.  That's our burden, and we'll go and get the

5   records.

6          So, you know, it is a minimal burden in order for us

7   to discover relevant evidence that will be relevant to rebut

8   their damages claims, potentially challenge the reasonableness

9   of his belief, and, quite frankly, potentially establish a

10  McKinnon defense based on certain representations that were

11  made to the company in his application.

12         THE COURT:  All right, thank you.

13         Do you have anything to add, Mr. Carter, as to any of

14  the plaintiff's motions?

15         MR. CARTER:  Just quickly.

16         MS. BERTRAM:  And I had a little more, Your Honor, if

17  you wanted to hear it on the medical evidence.

18         THE COURT:  I will let him address this first.

19         MS. BERTRAM:  Okay, thank you.

20         MR. CARTER:  I'm struggling with how the timecards of

21  the actual contract at issue could not be relevant.  And then

22  his prior employment which he said he didn't rely on, except he

23  has referred generally to his many years of experience is

24  relevant for his good faith belief.

25         But the fact is, and I have said this to counsel, is

1 that he does not have anything else in his possession of Day

2 and Zimmerman or SAIC, any of those documents to produce.  Nor

3 do I think should he be required to sign a release to make them

4 produce them.

5         And what is very important is what goes along with

6 that is that every time you get sent to Afghanistan by a

7 contractor, they do a full medical workup.  And in that full

8 medical workup that would be in your file would be all of the

9 medical documents, psych history and that sort of thing, that

10 we're opposing.

11        With respect to what the experts have relied on, Ms.

12 Bertram has everything that our experts have relied on.  They

13 rely generally on when you do a vocational rehabilitation

14 assessment, you look at the resumé.  I mean, you just -- that's

15 what he relied on.  The defendant has that.

16        With respect to the -- what Ms. Bertram just said

17 about Ms. Santiago being a CIDNE operator, he said she would be

18 able to be a CIDNE operator if trained.  Not that she was one.

19 They knew -- they hired her knowing that she was not a CIDNE

20 operator or trained to be one.

21        So, it's really the scope of what we're talking about

22 here is 20 years of psychological history, 20 years of prior

23 employment history.

24        I've represented in my papers, I've got no problem

25 producing the post-BAE medical history other than the

1    psychological test that he has to do every year because he is a

2    disabled veteran.  I don't think that's relevant.

3           The mitigation documents I'm prepared to produce.  I

4    didn't know that -- other than the mitigation log, this is the

5    first we're learning that we need to produce the actual online

6    applications and all of those other things.  But again, I want

7    it to be clear that that would not include the medical workup

8    for my client.

9           THE COURT:  All right.  You know, one thing that

10   concerns me is why these motions are coming so late, to tell

11   you the truth, especially the forensic exam.  How quickly can

12   that be done, Ms. Bertram?

13          MS. BERTRAM:  It can be done very quickly, Your

14   Honor.  We could send a forensic expert to Mr. Hosch's home.

15   And it typically takes about half a day to do the imaging

16   process.  And the review process usually takes a matter of

17   days.

18          This is not a big, given advancements in technology,

19   this is not a big elaborate process.  We did not become aware

20   of -- obviously, we had suspicions and had concerns when we

21   made the initial request for a psychiatric -- I'm sorry.  For a

22   forensic review.  Those concerns were really exacerbated on

23   November 4 at plaintiff's deposition when he talked about going

24   in and downloading all of these documents off the military

25   computer and deleting certain documents and such.

1          And then -- and then when we got third-party

2    productions in and saw that there were a lot of documents that

3    were not being produced to us that were at least at one point

4    on plaintiff's personal e-mail, I conferred with Mr. Carter.

5    There were some challenges scheduling this hearing in terms of

6    with the holiday last week and then Mr. Carter was not

7    available the Friday before that.  We had hoped to schedule

8    this for two weeks before today.

9          THE COURT:  All right.  Well, I find that the

10   plaintiff has put his physical and mental health clearly at

11   issue in this case.  And so, I am going to grant the motion to

12   compel as to that.

13          As far as the SAIC and prior employment history, I'm

14   not sure that it's going to be admissible, but I think at this

15   point there is enough of an issue here as to what he knew and

16   how that impacted his claims against BAE, that what he knew

17   during his employment, his prior employment with SAIC, and what

18   he was disciplined for there and so forth, is at issue at this

19   point.  So, I'm going to allow that as well.

20          And as far as the forensic examination is concerned,

21   I think there is a legitimate issue here as to whether or not

22   what he has provided is everything.  And he has, you know,

23   admitted to taking stuff off of his work computer, putting it

24   on his home computer and then -- you know, and cleaning it up

25   here or there.  I am not sure where he did.

1          But I think that there is a real issue here as to

2     whether or not he's produced everything that he says that he's

3     downloaded.  I've run into this before in similar cases, and I

4     think that it's appropriate that they be allowed to

5     forensically investigate his computer, electronic devices, and

6     online accounts.

7          So, I'm going to grant both of the defendant's

8     motions in whole.

9          Now, you have a discovery cutoff coming up in a week

10    and you have got a final pretrial conference after that.  So, I

11    am not going to move that at all, but I will give you until the

12    end of the month to -- what I will do is give you until the end

13    of the month, to the 31st, to exchange your pretrial

14    submissions.

15         And if you need to schedule a couple of depositions

16    or something like that to clean things up within that last

17    couple of weeks, I'll allow you to do that.  It sounds like

18    maybe you're through with that.

19         But exchange your pretrial submissions then on the

20    31st.  And objections would be due seven days after that.

21    Okay?

22         MS. BERTRAM:  Okay.

23         THE COURT:  Are there any other issues?

24         MR. CARTER:  Your Honor, just a question.  When we

25    talk about a forensic review, we've run into this before, there

26

1   is obviously issues of privilege.  So, I am not sure how --

2          THE COURT:  Well, I thought he only had his work

3   things on here?

4          MR. CARTER:  Well, that's --

5          THE COURT:  No, he's got other stuff as well?

6          MR. CARTER:  That's the point, is that --

7          THE COURT:  Okay.  I'll allow counsel to be present

8   during the forensic examination, and then you all can earmark

9   anything that you think is privileged.  If you can't come to an

10  agreement about what is privileged, then you can bring a motion

11  before me as to that.

12         But I will allow you to be present during the review

13  so that you can perhaps iron that out.  It may make sense for

14  both of you to be there during the review so you can just

15  eliminate anything that is obviously privileged, e-mails

16  between counsel and plaintiff, and so forth.  Okay.

17         MR. CARTER:  Thank you.

18         MS. BERTRAM:  Your Honor, I had one small issue --

19         MR. CARTER:  Oh, I'm sorry, before we leave that.  My

20  client is in Afghanistan, so it's not a matter of sending

21  somebody to North Carolina for half a day.  It's -- I frankly

22  don't know what he has got with him and where either one or

23  both of the devices at issue are.

24         And I further believe that the Roshan phone is like

25  an iPhone which doesn't have -- everything is up in a cloud.

```
 1   It's not on the device itself.

 2            So, there are issues here, technical in nature, that

 3   we have.  But again, if this is what the defense wants to do

 4   and Your Honor is ordering it -- I just am making these points.

 5   There are going to be issues about getting access to the

 6   devices if it's one that he's not even using --

 7            THE COURT:  Well, he could ship them -- he could ship

 8   them back here.

 9            MR. CARTER:  Right.

10            THE COURT:  That might make the easiest thing to do,

11   have him ship them back here for review, and then you can be

12   there when the -- when the forensic exam is made.

13            MR. CARTER:  Okay.  I'm not sure that's the device at

14   issue, but, okay, we'll --

15            THE COURT:  Well, I would think he could do it with

16   regard to all of these, whatever is over there, couldn't he?

17            MR. CARTER:  Certainly with whatever is over there.

18            THE COURT:  Right.

19            MR. CARTER:  If there is something in North Carolina

20   where he is not there, I don't know how to get access to that.

21            THE COURT:  Well, he's going to have to figure out

22   something.

23            MR. CARTER:  We'll figure that out.  Thank you, Your

24   Honor.

25            THE COURT:  Okay.
```

28

1          MS. BERTRAM:  I think that your -- first of all, I

2    wanted to clarify timing.  You had indicated that something was

3    due within seven days, and I just missed what you said.

4          THE COURT:  Objections to your pretrial submissions.

5          MS. BERTRAM:  Okay.

6          THE COURT:  Will be due seven days afterwards.  So,

7    January 7.  I'm hoping that's a weekday.  I think it is.

8          MS. BERTRAM:  Okay.  And --

9          THE COURT:  And then otherwise everything that I've

10   ordered to be produced with regard to these, to the motions to

11   compel, really should be done within a week or so.

12         MS. BERTRAM:  Right.  Okay.  We understand.

13         THE COURT:  Okay.

14         MS. BERTRAM:  We had an issue come up last night.  We

15   received a declaration from a witness, and we were going to ask

16   for leave to take his deposition.  But since you've said we can

17   take depositions through the end of the month --

18         THE COURT:  I will allow you to just do that.

19         MS. BERTRAM:  Yeah.

20         THE COURT:  I am not going to worry about if you get

21   them in sometime before the end of the year.

22         MS. BERTRAM:  Okay.

23         THE COURT:  Okay.

24         MS. BERTRAM:  Great.  Thank you so much.

25         THE COURT:  All right, thank you.

29

1          MR. CARTER:  Thank you, Your Honor.

2          NOTE:  The hearing concluded at 10:55 a.m.

3      -------------------------------------------------

4

5          C E R T I F I C A T E  of  T R A N S C R I P T I O N

6

7          I hereby certify that the foregoing is a true and

8   accurate transcript that was typed by me from the recording

9   provided by the court.  Any errors or omissions are due to the

10  inability of the undersigned to hear or understand said

11  recording.

12

13          Further, that I am neither counsel for, related to,

14  nor employed by any of the parties to the above-styled action,

15  and that I am not financially or otherwise interested in the

16  outcome of the above-styled action.

17

18

19

20

21

22               /s/ Norman B. Linnell

23          Norman B. Linnell

24          Court Reporter - USDC/EDVA

25

# EXHIBIT B

Cornelius V. Hosch                                                    November 4, 2013
Washington, D.C.

Page 74

1      Q   Do you know why he shredded it?
2      A   That's -- that's the protocol for it.
3   You know, once you get your hand receipt back, the
4   original, you shred it.
5      Q   When did you physically give up the space
6   in the Pink Palace?
7      A   Physically it was -- without looking at
8   the e-mails -- I would have to look at the actual
9   e-mail traffic to verify the exact dates, but I'm
10  thinking around the first or the second week of
11  May -- when I was identified that I was basically
12  going to RC-North, whenever that date was, that's
13  when I closed out the final one because I had a
14  couple of things that he was going to let Oscar keep,
15  but we never linked up, so...
16     Q   And what were the items that Mr. Smith
17  was going to allow Mr. Denson to keep?
18     A   What I remember right offhand was two
19  printers.  I don't know all the items that was on
20  that list.  I'd have to go back and look at some
21  e-mails or something.
22     Q   And what -- what do you mean when you say

Page 75

1   that Mr. Denson and you couldn't link up?
2      A   Well, I sent Mr. Denson a number of
3   e-mails, phone calls, even visited the office space
4   that he was assigned to, and he never would return my
5   calls.  We never had an opportunity to finish up the
6   last hand receipt.
7          So at that point, I transferred
8   everything back over to the government since I could
9   not get in touch with him.  Not the government
10  customer but Mr. Smith.
11         And when he got everything back, you
12  know, then that was it.  You know, Oscar never tried
13  to meet up with me to get those items.
14     Q   Now, if he had met with you, what would
15  he have received, based on your understanding?
16     A   What he could have -- he would have had
17  to talk to Mr. Smith about everything that he was
18  willing to -- to let Oscar have.  But I do know the
19  two printers -- he had additional printers, but he
20  would have to talk with him, and he may have helped
21  him out.  But he was not obligated in any way at all
22  to provide anything to Oscar or BAE Systems at that

Page 76

1   time.  That was strictly from a personal standpoint
2   that he allowed me to use those items.
3      Q   And you had actually met with Mr. Denson
4   several times prior to -- prior to the point where
5   you were trying to coordinate with him regarding the
6   hand receipt, correct?
7      A   Now, when you say "meet with him,"
8   what -- what are you referring to?
9      Q   You met with him in person regarding
10  transition of the region, correct?
11     A   Yes.  We met with the transition of the
12  region on one day.
13     Q   Okay.  What date was that?
14     A   The exact date -- I would have to look at
15  the actual traffic.  But what I can recall from
16  memory now is either -- I'll give you the whole time
17  frame.  From the 2nd to the 3rd, me and Oscar Denson
18  were supposed to go through the transition of
19  authority.  It was complete on 4 May of 2012.
20     Q   And did you and Mr. Denson meet on the
21  2nd or the 3rd?
22     A   I would have to go back through the

Page 77

1   e-mails to see the exact date that we actually sat
2   down.  But what we do during that transition, we sit
3   down; we basically -- I took him around to all the
4   locations where he needed to go for vehicle
5   registration.  I took him to the -- what is called
6   the CJ2-J6.  That's what gives you your authorization
7   to use internet access and to access any accounts
8   that we had set up.  It also gave him an
9   authorization to get into the actual gates in the
10  compound where we worked at.  So I took him to the
11  security office also.  I also took him to meet the
12  government customer, which was Major Tobias and
13  Lieutenant Colonel Mills in the CJ2 office on Bagram.
14         After we did all that, me and Mr. Denson,
15  we went and had -- I had a telephone conference set
16  up with all of our personnel.  Prior to that
17  telephone conference, I gave Mr. Denson a copy of all
18  the personnel documents, to include the location of
19  all those personnel.
20         I took him on the computer and showed him
21  the SharePoint folder that I had created to just help
22  me manage the particular region.  This was not a BAE

20  (Pages 74 to 77)

Cornelius V. Hosch                                                   November 4, 2013
Washington, D.C.

Page 78

1    directive.  All the regions did not have it.  It was
2    an item that I used to manage personnel.  And I was
3    leaving all this for him.
4          However, I told him that I did not have
5    any administrative rights; that he would have to go
6    to the CJ6.  And that's the communication help desk
7    for all computers and networks.  He would have to go
8    there to establish a password that would allow him to
9    log on and enter any shared drives that they have on
10   that particular system.
11         So he had a copy of all the documentation
12   that he needed to operate RC-East until he got -- and
13   log on to go there himself.
14         After that, me and Mr. Denson, we
15   basically set up a telephone conference with all the
16   team leads for all the personnel for Regional Command
17   East.  So as me and Mr. Denson sat at my desk -- he
18   sat in my seat, which was the main seat there; I sat
19   in the alternate seat which was closer to the wall
20   right under the air conditioning -- and what we did
21   was that we started to talk to all the team leads.
22         All the team leads had called in to what

Page 79

1    is called Adobe Connect.  After we verified that all
2    the team leads were present, I told all the team
3    leads that I will be departing going to RC-North.  I
4    told them that Oscar Denson would be taking over as
5    the regional manager for Regional Command East.
6          At that time me and Mr. Denson went
7    around to all the team leads.  And what we were
8    looking for by communicating with all the team leads
9    in this venture was to -- for them to give us
10   100 percent accountability that all personnel that
11   were on the personnel manning document were a
12   hundred percent accounted for, and they were at their
13   location or they were on R&R, which is relax and
14   recovery PTO.
15         So at that time we went to every team
16   lead.  Every team lead -- as the individuals went
17   through the manning document of all of their
18   personnel, myself and Mr. Denson, we went person for
19   person that was assigned based on the manning
20   document that I maintained and based on the BAE
21   Systems CUP.  That's a manning document that the PMO
22   office and that Jack -- that Dan Weber maintained and

Page 80

1    sent out to all the regional managers.
2          So we had both of those documents and
3    went down all the individuals for RC-East with the
4    team leads to ensure that we had 100 percent
5    accountability of all our personnel at every location
6    for Regional Command East during that transition.
7      Q   And the manning document is something
8    that was unique to your region; is that right?
9      A   The actual manning document -- it's two
10   different ones.  The one that I used to manage my
11   personnel, I just had up top Regional Command East.
12   Is that the one you're talking about?
13     Q   Well, you said that the two of you used
14   two different documents, what you called a manning
15   document, and then the BAE CUP document.
16         So I was asking about the manning
17   document.  Is that something that --
18     A   That was internal to my region.  I set
19   that up myself.
20     Q   Okay.  And what was the name -- what did
21   you refer to that document as?
22     A   My manning document -- RC-East's manning

Page 81

1    document.
2      Q   And you said that you provided copies of
3    documents to Mr. Denson.  Were you referring to the
4    manning document and the CUP document?
5      A   Yes.  I provided him -- it was two
6    different types of documents I provided.  I provided
7    him with a digital copy that was sent through e-mail,
8    and I also provided him a hard copy that was
9    basically given him -- to it in his hand.
10     Q   And the documents, the digital copies
11   that you provided to him, were they the same
12   documents that were on the SharePoint?
13     A   Yes.  It was all the documents that he
14   needed for RC-East.  Every single document.  It was
15   the leave tracker, talks about all the people that's
16   on R&R that have requested R&R or that is scheduled
17   to go.
18         It also included all the manning, meaning
19   the location of all our personnel.  It included any
20   reports that we had to turn in, where those are
21   actually kept.  However, in order for him to get
22   those documents, he had to go up and finish

21  (Pages 78 to 81)